# United States Court of Appeals
## For the First Circuit

No. 17-1180

EDUARDO SOTO-CINTRÓN,
on his own behalf and on behalf of his minor son A.S.M.;
A.S.M., Minor,

Plaintiffs, Appellants,

WINDY MARRERO-COLÓN,
solely on behalf of her minor son A.S.M.,

Plaintiff,

v.

UNITED STATES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Howard, Chief Judge,
Lipez and Thompson, Circuit Judges.

Jorge Martínez-Luciano, with whom Emil Rodríguez-Escudero was on brief, for appellants.
Mainon A. Schwartz, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Thomas F. Klumper, Assistant United States Attorney, Acting Chief, Appellate Division, were on brief, for appellee.

August 20, 2018

**LIPEZ**, **Circuit Judge**.  Plaintiff Eduardo Soto-Cintrón and his 17-year-old son went to a post office in Coto Laurel, Puerto Rico to pick up some mail.  While Soto-Cintrón waited in his red Ford F-150 truck, his son retrieved some envelopes from the post office and returned to his father's vehicle.  As the two pulled out of the parking lot, they were stopped by a number of federal law enforcement agents with guns drawn.  Soto-Cintrón was removed from his vehicle and handcuffed, and he and his son were detained for up to twenty minutes.

The agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") had stopped the wrong people.  Once they realized their mistake, the agents arrested the person who had received the illegal shipment of firearms, and released Soto-Cintrón and his son.  Soto-Cintrón later filed a claim against the United States under the Federal Tort Claims Act ("FTCA") for false imprisonment.  The district court granted summary judgment to the government, and Soto-Cintrón appealed.  Though our analysis of Soto-Cintrón's FTCA claim differs from the district court's, we ultimately reach the same conclusion, and affirm.

**I.**

In May 2013, the United States Postal Inspection Service ("USPIS") intercepted a package sent from Orlando, Florida to Puerto Rico.  Suspecting that the package contained six illegal Glock semi-automatic pistols, USPIS personnel requested the

- 3 -

assistance of the ATF to set up a controlled delivery. The agencies devised a plan to leave a notice at the addressee's residence informing him that he could claim the package at the U.S. Post Office in Coto Laurel. Pursuant to the plan, USPIS personnel would assume the primary surveillance positions inside the post office and in the parking lot, while ATF agents would be posted around the perimeter of the parking lot. Whoever showed up to collect the package would be arrested, as would anyone else linked to the receipt of the package.

During the operation, a USPIS inspector used radio communication to announce the separate arrival of two vehicles to the post office parking lot. First, the inspector identified a red Ford F-150 which turned out to be Soto-Cintrón's. The inspector stated that the occupants of the vehicle remained seated for some amount of time before the younger occupant went into the post office. Second, the inspector announced the arrival of a white Ford F-150 which, as it turned out, was driven by the suspect.

While both vehicles were still in the parking lot, the USPIS inspector broadcasted that the package had been delivered to the suspect. Then, without identifying which vehicle the suspect placed the package in, the radio operator stated that the red Ford F-150 -- belonging to Soto-Cintrón -- was leaving the parking lot.

One of the ATF agents on the receiving end of these radio communications was Special Agent Vladimir González. He was stationed on an access road at the perimeter of the parking lot in a vehicle driven by ATF Task Force Officer Jose Fajardo, and also occupied by Special Agent Raul Peña-López. When Special Agent González heard the radio transmissions he could not discern which truck contained the suspicious package. After unsuccessfully attempting to obtain clarification from a USPIS inspector, he made the decision to stop the red truck driven by Soto-Cintrón before it could leave the parking lot. Special Agent González instructed Officer Fajardo to block the parking lot exit with his vehicle, and the three agents approached Soto-Cintrón's truck with guns drawn, identifying themselves as police and ordering Soto-Cintrón and his son to put their hands up.

Soto-Cintrón and his son had the windows rolled up and the air conditioning and radio turned on, so they could not hear the agents' commands. One of the officers pulled Soto-Cintrón out of his vehicle, handcuffed him, and placed him face down on the pavement. His son was also handcuffed and placed next to him, but was soon uncuffed and allowed to sit on the ground away from the vehicle. The agents questioned Soto-Cintrón about the package and performed a visual inspection of his truck. Soto-Cintrón, of course, denied any knowledge of the illegal firearms, and the agents' visual inspection did not reveal the suspicious package.

At some point during Soto-Cintrón's detention, the agents learned that the actual suspect -- the person in the white truck -- had been apprehended, and that Soto-Cintrón and his son were not involved in the illegal firearms delivery. The agents accordingly released Soto-Cintrón and his son. Their detention lasted approximately fifteen to twenty minutes.

Based on this incident, Soto-Cintrón sued the United States in February 2015.[1] The complaint alleges that the ATF agents committed false imprisonment under Puerto Rico law and that the United States is liable for the tort under the FTCA. See 28 U.S.C. §§ 2674, 2680(h).[2] Following a period of discovery in which Soto-Cintrón chose not to conduct any depositions, the government moved for summary judgment, arguing primarily that Soto-Cintrón's detention constituted a Terry stop based on the ATF agents' reasonable suspicion of criminal activity. See Terry v. Ohio, 392 U.S. 1 (1968). The district court granted the government's motion, explaining that Puerto Rico would not impose tort liability for

---

[1] More specifically, Soto-Cintrón sued on his own behalf and on behalf of his minor son, and the minor's mother, Windy Marrero-Colón, also sued on her son's behalf. We refer to Soto-Cintrón as the sole plaintiff for simplicity.

[2] The complaint also asserts a claim for assault under Puerto Rico law, but that claim is dependent on the success of Soto-Cintrón's false imprisonment claim. Because we affirm the district court's grant of summary judgment to the government on the false imprisonment claim, we do not need to separately address the assault claim. That claim necessarily fails as well.

false imprisonment where an officer conducts a stop based on his reasonable suspicion of criminal activity.  See id. at 30.

On appeal, Soto-Cintrón contends that the court erred by importing Terry's reasonable suspicion standard into Puerto Rico tort law.  He argues that Puerto Rico requires officers to meet a more demanding "reasonable cause" standard, which both parties treat as interchangeable with the familiar probable cause standard.  Abandoning its Terry argument,[3] the government counters that the ATF agents satisfied Puerto Rico's reasonable (or probable) cause standard.  Alternatively, it argues that even if the agents did not have probable cause to arrest, Puerto Rico would not impose liability for false imprisonment because they would be entitled to qualified immunity if plaintiffs had filed a Bivens claim.  We agree with the government's alternative argument, and affirm.

---

[3] At oral argument, the government denied that it had abandoned its Terry theory, asserting instead that it had merely shifted focus to its other positions.  We find this argument untenable.  The government's response brief repeatedly refers to the appropriate standard for false imprisonment under Puerto Rico law as being "reasonable cause," and does not even cite to Terry. It is axiomatic that arguments not developed on appeal are abandoned.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

### A. The FTCA and Puerto Rico False Imprisonment Legal Standards

The FTCA provides "a limited congressional waiver of the sovereign immunity of the United States for tortious acts and omissions committed by federal employees acting within the scope of their employment."  Díaz-Nieves v. United States, 858 F.3d 678, 683 (1st Cir. 2017).   In an amendment to the FTCA, Congress expressly waived sovereign immunity for false imprisonment when the tort is committed by a "law enforcement officer[] of the United States Government."   Pub. L. No. 93-253, 88 Stat. 50 (1974) (codified at 28 U.S.C. § 2680(h)); see also Solis-Alarcón v. United States, 662 F.3d 577, 583 (1st Cir. 2011).   The government's liability under the FTCA is coextensive with that of "a private individual under like circumstances."  28 U.S.C. § 2674.  We look to local law to determine whether the government is liable for its agents' allegedly tortious conduct.  See Díaz-Nieves, 858 F.3d at 683; 28 U.S.C. § 1346(b)(1).  "In this case, then, we must extract the substantive rules of decision from Puerto Rico law." Calderón-Ortega v. United States, 753 F.3d 250, 252 (1st Cir. 2014).

Puerto Rico imposes liability for false imprisonment when "[a] person, whether or not a law enforcement officer," tortiously or negligently "detain[s] or cause[s] the unlawful detention of another person."  Ayala v. San Juan Racing Corp., 12

P.R. Offic. Trans. 1012, 1021 (P.R. 1982); see also P.R. Laws Ann. tit. 31, § 5141 (imposing liability for fault or negligence that causes injury).  To prevail on a false imprisonment claim, "it is essential that the individual performing the arrest lack reasonable cause for believing that the arrestee committed a felony."  Díaz-Nieves, 858 F.3d at 684.  This is so because Puerto Rico Criminal Procedure Rule 11 authorizes law enforcement officers to make warrantless arrests where they have "reasonable cause" to suspect that a person committed a felony.  P.R. Laws Ann. tit. 34a, Ap. II, § 11(c).

"[A]side from the requirements of legality contained in [Rule 11]," the Puerto Rico Supreme Court has explained that "we should resort to the concept of the reasonable man" to assess liability for false imprisonment.  Ayala, 12 P.R. Offic. Trans. at 1024.

> The reasonableness of the actions of a person sued in a civil action for damages for an alleged unlawful detention of the plaintiff, and his liability for them, should be weighed together with the following factors: the defendant's person, age, schooling, moral condition, and prior experience; the person, age, appearance and conduct of the detained person; knowledge that defendant had, on the day of the events, about the detained person and those people that had relations with him, suspicious conduct, including the seriousness of the crime it could imply, the place, occasion, and frequency of said conduct.  This is in no way intended as an exhaustive list. Each case has its own characteristics, which

must be taken into account when determining whether or not there was a false arrest.

Id. at 1025. Put another way, Puerto Rico imposes liability for false imprisonment where, considering all the circumstances, an arresting officer "not only makes a mistake" but also "incurs negligence." Valle v. Commonwealth of Puerto Rico, 157 D.P.R. 1, 24 (P.R. 2002) (emphases omitted)).

We have interpreted this standard as being consistent with federal qualified immunity principles -- a doctrine that allows room for officers' "reasonable mistakes," Saucier v. Katz, 533 U.S. 194, 205 (2001), and protects from liability "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986). In Solis-Alarcón, officers from the Drug Enforcement Agency ("DEA") had reason to believe that a suspect in a major drug ring resided at the plaintiffs' house. 662 F.3d at 579. The DEA obtained an arrest warrant for the suspect and, wielding guns, entered the house without the plaintiffs' consent. Id. The officers then allegedly detained the plaintiffs while they searched the house for 15-20 minutes. Id. at 580. They did not find the suspect at the house. Id.

Two years later, the plaintiffs brought a Bivens claim against the DEA agents, alleging that the search violated the Fourth Amendment, and a Puerto Rico false imprisonment FTCA claim

against the United States. Id.; see also Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 389 (1971) (recognizing a private right of action against federal agents for violation of the Fourth Amendment). The district court granted summary judgment to the defendants on both claims, and the plaintiffs appealed. Solis-Alarcón, 662 F.3d at 580.

We first held that the DEA agents were entitled to qualified immunity on the plaintiffs' Bivens claim. Under the Fourth Amendment, officers executing an arrest warrant at a residence must have a "reasonable belief that the target named in the arrest warrant resides at the dwelling in question and will be present at the time of the entry." Id. Given the information available to the agents at the time, we concluded that even if their "judgment" that the suspect resided at the plaintiffs' house was "unreasonable, it was not 'manifestly unreasonable.'" Id. at 582 (quoting Ringuette v. City of Fall River, 146 F.3d 1, 5 (1st Cir. 1998)). Hence, "if there was error at all . . . it was not so egregious as to defeat qualified immunity." Id.

Having performed this qualified immunity analysis in the Bivens context, we turned to the plaintiffs' false imprisonment FTCA claim against the United States. We reasoned that the scope of liability under Puerto Rico's false imprisonment tort mirrored the federal qualified immunity principles that applied to individual officers in a Bivens case.

> Puerto Rico imposes liability for fault or
> negligence that causes injury, but protecting
> law enforcement agents for reasonable mistakes
> is common, and in at least two decisions, this
> court assumed that Puerto Rico tort law would
> not impose personal liability for mistaken
> arrests where the officers would be protected
> in Bivens claims by qualified immunity.

Id. at 583 (internal citations omitted) (referencing Abreu–Guzmán v. Ford, 241 F.3d 69, 75-76 (1st Cir. 2001) and Rodriguez v. United States, 54 F.3d 41, 45-47 (1st Cir. 1995)).  We further explained that Puerto Rico recognizes the need to balance "the right to compensation of a citizen who is injured by the wrongful or negligent acts of a state officer," against "the duty of government authorities to act vigorously in the investigation of criminal causes."  Id. (quoting Valle, 157 D.P.R. at 25).  This was the same "view that animates federal qualified immunity doctrine." Id.

Given the parallel between Puerto Rico's false imprisonment tort and federal qualified immunity principles, we held that the DEA agents who were entitled to qualified immunity on the Bivens claim would not be subject to liability for false imprisonment under Puerto Rico law.  And, because the agents did not commit a tort, the United States was not liable for its agents' actions under the FTCA.[4]

---

[4] The Solis-Alarcón court also noted that if Puerto Rico's false imprisonment jurisprudence had not mirrored qualified immunity principles, "a significant question might arise whether

**B. Applying the Puerto Rico Law of False Imprisonment**

Viewing the facts in the light most favorable to Soto-Cintrón, the ATF agents' actions reflect the type of reasonable mistake for which Puerto Rico would not impose liability. In reaching this conclusion, we apply the reasonableness approach detailed by the Ayala court, focusing on the "knowledge that defendant had . . . about the detained person and those people that had relations with him, suspicious conduct, including the seriousness of the crime it could imply," as well as the other factors identified there. Ayala, 12 P.R. Offic. Trans. at 1025. We also remain mindful of our precedent holding that the scope of liability under Puerto Rico false imprisonment mirrors liability under qualified immunity principles. See Solis-Alarcón, 662 F.3d at 583; Abreu–Guzmán, 241 F.3d at 75-76.

Given that Special Agent González initiated Soto-Cintrón's arrest, we focus our analysis on his knowledge at the

---

any local court could impose damage liability on federal officers where they would be exempt in a federal lawsuit and whether Congress under the FTCA would expect the federal government to shoulder such liability." Id. at 583-84. Compare Norton v. United States, 581 F.2d 390, 393 (4th Cir. 1978) (holding that the government in an FTCA case is entitled to assert defenses available to its agents individually), with Castro v. United States, 34 F.3d 106, 111 (2d Cir. 1994) (stating that "qualified immunity will not immunize the United States from liability" in an FTCA case). The Solis-Alarcón court did not need to answer this "significant question," and neither do we. 662 F.3d at 583; cf. Guerra v. Sutton, 783 F.2d 1371, 1375-76 (9th Cir. 1986) (declining to decide whether qualified immunity "would . . . preclude recovery under the [FTCA]").

time of that decision. At that point, the radio operator had announced that the suspect had left the post office with a package containing six illegal firearms and then announced that the red truck was leaving the parking lot. The temporal proximity of these announcements led González to believe that the suspect -- who González knew "matched the description of the driver of the white Ford F-150" -- had placed the firearms in the red truck. He could "not think of any other reason why the USPIS inspector would have announced the departure of the red Ford F-150," and, from his experience, it was common for a person picking up an illegal package to hand it off to someone else at the post office to minimize the risk of being caught. Still, he attempted to obtain clarification from USPIS personnel about whether the firearms were in the white truck or the red truck, but his efforts were unsuccessful.

Despite this uncertainty, Special Agent González had to make a decision. On the one hand, if he let Soto-Cintrón's truck leave the parking lot, he risked letting six illegal firearms make their way into the community. On the other, if he stopped the truck, he risked detaining two innocent persons. Special Agent González chose to stop the truck. He directed Officer Fajardo to block the parking lot exit with his vehicle, and González, Fajardo, and Special Agent Peña-López initiated the arrest. They released

- 14 -

Soto-Cintrón and his son once it became clear that the two were not involved in the firearms delivery.

At worst, these facts show a team of agents making a reasonable mistake -- in the heat of a dangerous moment -- about the existence of the reasonable cause necessary to arrest Soto-Cintrón and his son.  Indeed, "it is reasonable for police to move quickly if delay 'would gravely endanger their lives or the lives of others,'" even if when "judged with the benefit of hindsight, the officers may have made 'some mistakes.'" City & Cnty. of S.F., Cal. v. Sheehan, 135 S. Ct. 1765, 1775 (2015) (applying qualified immunity) (quoting Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 298-99 (1967) and Heien v. North Carolina, 135 S. Ct. 530, 536 (2014)).  As we have explained, Puerto Rico does not impose tort liability for such mistakes.  See Solis-Alarcón, 662 F.3d at 583 (concluding that Puerto Rico's position is consistent with the "common" approach of "protecting law enforcement agents for reasonable mistakes"); Abreu–Guzmán, 241 F.3d at 75-76 (holding that agents' "objectively reasonable belief that there was probable cause . . . extinguishe[d] any basis for finding liability for . . . false imprisonment" under Puerto Rico law).

Soto-Cintrón's argument to the contrary is unavailing. He contends that it could not have been reasonable for the ATF agents to make the arrest because: (1) Special Agent González "had eyes on" Soto-Cintrón and his son and thus knew that the son

- 15 -

returned from the post office with only a few envelopes in hand; and (2) that it would be unreasonable to conclude that six Glock pistols could fit in the envelopes.

Even if we were to infer that Special Agent González personally observed Soto-Cintrón's son, it would not undermine his basis for stopping Soto-Cintrón's truck. The radio operator told González that "the package had been delivered to the suspect who was then exiting the Post Office" and González knew that the suspect "matched the description of the driver of the white Ford F-150." Thus, González's basis for stopping Soto-Cintrón's truck was not that Soto-Cintrón's son had retrieved the package from the post office and placed it in his father's truck. González believed that the driver of the white truck was the one who received the package. His suspicion -- based on the radio operator's communications regarding the red truck's exit from the parking lot -- was that the driver of the white truck had placed the package in Soto-Cintrón's truck. González's supposed knowledge that Soto-Cintrón's son returned from the post office carrying only envelopes is irrelevant to the reasonableness of this suspicion.

In sum, when the USPIS inspector's radio communications caused confusion as to the whereabouts of the firearms,[5] González

---

[5] Soto-Cintrón does not allege that the USPIS radio operator's actions created any tort liability for the United States under Puerto Rico law.

made the decision to prevent Soto-Cintrón and his son from leaving the parking lot.  That reasonable decision would not expose the arresting agents to liability for Puerto Rico false imprisonment, and, given the vicarious liability premise of the FTCA, it does not expose the United States to liability.

### III.

For the reasons discussed above, we affirm the district court's judgment.

<u>So ordered.</u>